Howard LAMBERT

v.

STANLEY BOSTITCH, INC.

Nos. 98–9–M.P., 98–20–M.P.

Supreme Court of Rhode Island.

Feb. 2, 1999.

Ronald J. Creamer, Wakefield, for Plaintiff.

Thomas R. Bender, Michael T. Wallor, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on cross petitions for certiorari following a decision by the Appellate Division of the Workers' Compensation Court (Appellate Division). Howard Lambert (Lambert), a past employee of Stanley Bostitch, Inc. (Stanley Bostitch), alleged a work-related injury and sought workers' compensation benefits. After a trial judge denied and dismissed Lambert's claim, the Appellate Division reversed and awarded partial benefits. Stanley Bostitch petitioned this Court for issuance of a writ of certiorari on the issue of whether any benefits should have been awarded to Lambert. Lambert petitioned for certiorari of the Appellate Division's apportionment of responsibility in the award of benefits. We issued both writs and now affirm the Appellate Division's award and apportionment of benefits.

## Facts and Procedural History

Lambert began working for Stanley Bostitch in or about 1977 and held a variety of positions at the company. Most of the work performed by Lambert over his approximately eighteen years with Stanley Bostitch required him to carry out some form of repetitive manual labor such as loading stock onto milling machines, sanding burs off the stock, and operating a punch press. Lambert sustained several injuries to his hands in the course of his employment with Stanley Bostitch, including dislocating a finger and putting a screwdriver through the web space in the thumb area of his left hand. From 1986 or 1987 to 1995, Lambert worked as a wire winder.[1] In 1994, Lambert experienced pain and numbness in both hands and consulted a physician. In February of 1995, he injured his right wrist while lifting weights outside the workplace. The injury was painful and his wrist swelled significantly. Lambert, however, did not realize that he actually had broken his wrist, and he continued to perform his physically demanding duties at work. The pain increased, and finally Lambert sought medical treatment on or about June 30, 1995, from A. Louis Mariorenzi, M.D. (Mariorenzi), who informed Lambert that his wrist was fractured, put it in a cast, and instructed him not to return to work.

In September of 1995, after the cast was removed, Mariorenzi gave Lambert permission to return to work. When Lambert attempted to return to work, however, Stanley Bostitch refused to allow him to return. Because Lambert continued to experience pain in his right wrist and also was experiencing pain to a lesser degree in his left wrist, Mariorenzi referred him to Gary A. L'Europa, M.D. (L'Europa). Upon examination of the wrists, L'Europa found nerve abnormalities consistent with bilateral carpal tunnel syndrome, but did not venture an opinion as to its cause. Lambert then was examined by Arnold–Peter C. Weiss, M.D. (Weiss). In a report dated October 19, 1995, Weiss made a diagnosis of bilateral carpal tunnel syndrome that he believed was work-related, but aggravated somewhat in the right wrist by Lambert's non-work-related fracture. Weiss gave Lambert a cortisone injection in his right wrist but permitted his return to work, provided that he wore a splint at all times and did not lift more than five pounds. Lambert again attempted to return to his position, but Stanley Bostitch declined his offer.

Weiss performed surgery on Lambert's left wrist on December 4, 1995, and on his right wrist on March 4, 1996. On June 25, 1996, Weiss discharged Lambert from his care and gave him permission to return to work without any restrictions on his activities. At the request of the Abacus Management Group on behalf of Stanley Bostitch, Lambert also was examined by Gregory J. Austin, M.D. (Austin), who stated that the carpal tunnel syndrome was "largely related to his work activities with minor contributing factors of his personal profile and outside activities."

Lambert sought workers' compensation benefits alleging a disability commencing on or about December 4, 1995. The case was heard before a trial judge of the Workers' Compensation Court on March 26, 1996, April 11, 1996, May 24, 1996, and August 27, 1996. Lambert was not allowed to testify at trial regarding why he was not permitted to return to work as a wire winder. Stanley Bostitch, however, did stipulate that although Lambert attempted to return to work, Stanley Bostitch would not permit him to do so. The trial judge found that Lambert had been partially incapacitated from December 4, 1995, until June 25, 1996, but denied and dismissed Lambert's claim for benefits. The trial court found:

"1. The petitioner has failed to demonstrate by a fair preponderance of the credible evidence that he suffered a loss of earnings capacity on or about December 4, 1995, as a result of a work-related injury.

"2. The petitioner has failed to demonstrate any wages earned in the thirteen

---

1. Lambert testified that his duties as a wire winder included using a hoist to lift spools of wire weighing about 280 pounds onto a machine, pushing the spools by hand on a tram, filling a vat with glue, and using shears to cut a pulley weighing a thousand pounds before pulling it off the machine with a "jayco," which is similar to a chain pull.

(13) weeks prior to the injury on which to establish an earnings capacity."

Lambert appealed this decision to the Appellate Division, arguing that the trial justice should have looked to the thirteen weeks prior to his leaving Stanley Bostitch's employment in June of 1995, to calculate his earning capacity instead of the thirteen weeks prior to December 4, 1995, during which time he was unemployed. The Appellate Division sustained Lambert's appeal and reversed the trial judge, noting that the formula set forth in G.L.1956 § 28–33–20 was not the exclusive method of determining earning capacity. The Appellate Division ruled that it was permissible under the statute to determine earning capacity by looking to the thirteen weeks prior to the last date of employment.

After concluding that employment with Stanley Bostitch was a 50 percent contributing factor to Lambert's carpal tunnel injury, the Appellate Division entered a decree ordering Stanley Bostitch to pay Lambert 50 percent of his weekly benefits. Stanley Bostitch petitioned this Court for certiorari, challenging the Appellate Division's interpretation of § 28–33–20 as permitting any benefits under these circumstances. Lambert petitioned this Court to review the apportionment of Stanley Bostitch's liability. We issued both writs on April 30, 1998.

On review, Lambert argued that the Appellate Division erred as a matter of law in finding that his employment at Stanley Bostitch was only a "50 percent contributing factor to [his] disability" and that the Appellate Division acted without or in excess of its authority in awarding Lambert only 50 percent of his weekly benefits. Stanley Bostitch argued on certiorari that the trial judge correctly determined that Lambert was not entitled to weekly compensation benefits because he did not prove an earning capacity within the statutorily-prescribed time period, that the Appellate Division had the authority to make its own findings of fact to arrive at an

apportionment of liability, and that the panel's apportionment was supported by law and competent evidence.

### Standard of Review

When based on competent evidence, the findings of the Appellate Division are conclusive, absent fraud. *Martines v. Terminal Methods, Inc.*, 101 R.I. 599, 602, 225 A.2d 790, 792 (1967). Thus, in the absence of fraud, this Court will sustain the Appellate Division's decision, *K–Mart v. Whitney*, 710 A.2d 667, 668 (R.I.1998), "unless a question of law or a mixed question of fact and law is in issue." *Grimes Box Co. v. Miguel*, 509 A.2d 1002, 1003 (R.I.1986).

### Determination of Earning Capacity

Under § 28–33–20(a)(1) "earnings" are calculated on the basis of the employee's average weekly wages, earned during the thirteen weeks prior to the week of injury.[2] In September of 1995, Stanley Bostitch refused to allow Lambert to return to work. In the thirteen weeks prior to the week of his incapacity of December 4, 1995, Lambert was unemployed and received no wages. In the trial judge's view, Lambert had earned no wages for the thirteen weeks prior to his disability, and as a consequence, could not demonstrate any earning capacity. Stanley Bostitch argued on review that the trial judge's ruling was correct and that the Appellate Division incorrectly interpreted § 28–33–20(a)(1) to allow a court to use a claimant's average weekly wage from the thirteen weeks prior to the last day of *employment* to determine a claimant's earning capacity.

Under a strict reading of § 28–33–20(a)(1), weekly benefits are calculated by adding together the employee's wages for the thirteen weeks prior to injury, and then dividing by the number of weeks worked during the thirteen week period. "[W]eekly workers' compensation benefits are not paid to a worker because of a physical disability

---

**2.** General Laws 1956 § 28–33–20(a)(1) provides in relevant part that an employee's average weekly wage is determined by "dividing the gross wages * * * earned by the injured worker in employment by the employer in whose service he or she is injured during the thirteen (13) calendar weeks immediately preceding the week in which he or she was injured, by the number of calendar weeks during which, or any portion of which, the worker was actually employed by that employer * * *."

but rather because one has, as a result of a work-related condition or injury, suffered a loss of one's earning capacity." *Mullaney v. Gilbane Building Co.*, 520 A.2d 141, 143 (R.I. 1987). *See also Bailey v. American Stores, Inc./Star Market*, 610 A.2d 117, 119 (R.I. 1992) (noting that the General Assembly purposefully linked the average weekly wage to an employee's earning capacity). Hence, it is not the physical impairment for which an employee is compensated, but rather, benefits are awarded as a consequence of the "resulting lack of earning capacity." *Mullaney*, 520 A.2d at 143. In most cases, the formula set forth in § 28–33–20(a)(1) results in a fair determination of weekly benefits for the injured employee, but the facts of this case present an atypical situation. Lambert did not work at all for the thirteen weeks prior to the date he claimed a disability. Section 28–33–20(a)(1) does not specifically provide for the situation in which an employee has made a workers' compensation claim, but has earned no wages for the thirteen weeks preceding his or her incapacitation.

The case before us offers an opportunity to directly address this issue. Although we have decided two workers' compensation cases in which the claimants had not worked for the thirteen weeks prior to the date of disability, neither is applicable to the case at bar. In *St. Pierre v. Fulflex, Inc.*, 493 A.2d 817 (R.I.1985), we considered an appeal from a denial of benefits to an employee who had been laid off before the date of his disability. We sustained the Appellate Division's finding that because the employee was unemployed for the thirteen weeks preceding the date of incapacity, the employee had failed to show earning capacity. *Id.* at 818. We stated that the words of the statute requiring a claimant to show earning capacity during the thirteen weeks preceding incapacitation must be given their "plain and obvious meaning." *Id.* Stanley Bostitch argued here that *St. Pierre* mandates that Lambert's claim must fail. But in *St. Pierre*, the employee received unemployment benefits from the time he was laid off until his subsequent retirement. *Id.* at 817. Thus, our holding in *St. Pierre*, in which the determination of earning capacity in the thirteen weeks preceding injury was confounded by the fact that the claimant was receiving unemployment benefits, cannot serve as a template for the case before us.

The same year, this Court decided *Aguiar v. Control Power Industries, Inc.*, 496 A.2d 147 (R.I.1985), on which the Appellate Division relied in adjudicating Lambert's case. In *Aguiar*, we sustained the appeal of a disabled worker who became incapacitated after not having worked for a period of time. The employee was injured in May of 1972, but continued to work until he was laid off in April of 1974. *Id.* at 148. He did not file his petition for workers' compensation benefits until the spring of 1976, by which time he worked for a different employer. *Id.* Therefore, the case primarily dealt with "the liability of successive insurers or employers when the employee is incapacitated by an injury," *id.* at 149, and failed to address directly the issue of earning capacity. Consequently, neither *St. Pierre* nor *Aguiar* can serve as precedent for the instant case.

Two years after *Aguiar* and *St. Pierre*, we decided a case that lends some insight into the question of how literally courts must apply § 28–33–20(a)(1). In *Mullaney*, we held that employees who voluntarily retired from the work force, but at some later time made claims for workers' compensation benefits, had voluntarily surrendered the capacity to earn wages. Thus, "the threshold fact of whether loss or diminution of earning capacity existed was not presented." *Mullaney*, 520 A.2d at 144. We stressed in *Mullaney* the voluntary nature of the employees' retirement and the fact that this *voluntary* retirement precluded them from demonstrating any earning capacity. *Mullaney*, therefore, lends support to the proposition that in the event of a claimant's *involuntary* unemployment during the thirteen weeks preceding disability, the courts may develop an alternate method of calculating earning capacity. In Lambert's case, his failure to earn a weekly wage during the requisite thirteen weeks was not voluntary. In fact, although its reasons or motives were not disclosed, Stanley Bostitch stipulated that it rebuffed Lambert's attempt to return to employment as a wire winder.

It would be irrational and inconsistent with the underlying purpose of the workers' compensation statute to conclude that because the statute does not specifically provide for Lambert's situation, his claim must fail. The General Assembly surely did not intend that an employee such as Lambert, who had worked at a company for eighteen years, should be without protection because during the thirteen weeks preceding his incapacitation, he was not allowed to return to work.

■ "The primary object of [workers'] compensation is to provide economic assistance to an employee who is injured and thereby suffers a loss of earnings. * * * The [Workers'] Compensation Act is humane legislation designed to afford a modicum of economic shelter to one who has sustained an industrial injury." *Geigy Chemical Corp. v. Zuckerman*, 106 R.I. 534, 541, 261 A.2d 844, 848–49 (1970). Moreover, "the . Workers' Compensation Act is to be liberally construed to effect its benevolent purposes." *Bailey*, 610 A.2d at 120. Clearly, the Legislature did not intend to leave a claimant such as Lambert without recourse in the event an employer may have denied access to wages possibly on the basis of a disability. We are therefore in agreement with the Appellate Division's more elastic interpretation of the statute which in our opinion implemented the intent of the Legislature.

■ Moreover, the authority delineated in G.L.1956 § 28–35–28 allows the Appellate Division "[u]pon consideration of the appeal * * * [to] affirm, reverse, or modify the decree appealed from, and may itself take such further proceedings as just." Thus, while the statute does not expressly grant to the Appellate Division the authority to interpret the Workers' Compensation Act, it does so implicitly by the phrase, "may itself take such further proceedings as just." *Id.* Additionally, in *Callaghan v. Rhode Island Occupational Information Coordinating Committee/Industry Educational Council of Labor*, 704 A.2d 740, 744–45 (R.I.1997), we held that the Workers' Compensation Court has the authority to interpret and apply a statute in the event that doing so is necessary to determine obligations under the Workers' Compensation Act. We based this conclusion on the principles that the Workers' Compensation Court's jurisdiction is broad and that the Workers' Compensation Act is to be "liberally construed to effectuate its purpose." *Id.* at 744. These principles clearly buttress the Appellate Division's authority to interpret and apply the Workers' Compensation Act.

■ In this case, there was substantial medical evidence in the record, including that provided by Austin, the employer's examining physician, to allow the Appellate Division to determine that an occupational disease arose in the course of Lambert's employment at Stanley Bostitch. It is our conclusion that the Appellate Division correctly construed the statute to provide that Lambert's average weekly wage could be calculated on the basis of the amount he earned during the thirteen weeks immediately preceding the last day of his employment. The hiatus in Lambert's actual employment was due not to his retirement or to his unwillingness to work. Rather, his resulting lack of earning capacity during that period was caused, apparently totally in the case of his left wrist and at least partially in his right wrist, by an occupational disease. On the facts of this case, denying benefits to Lambert because he failed to earn wages during the thirteen weeks prior to his operation would be contrary to the Legislature's intent in passing the workers' compensation statute. Therefore, we affirm the Appellate Division's award of benefits to Lambert.

### Apportionment of Benefits

Having established that the Appellate Division had the authority to award benefits under the statute, we next turn to the issue of its apportionment of benefits. Lambert claimed that the Appellate Division erred as a matter of law when it found that his employment at Stanley Bostitch was only a 50 percent contributing factor, and further argued that the Appellate Division acted without or in excess of its authority when it found that Lambert's benefits should be apportioned by 50 percent. Stanley Bostitch, on the other hand, alleged that the Appellate Division had the authority to make findings of fact with regard to apportionment of liability and that its finding was supported both

by law and by competent evidence insofar as it determined that Stanley Bostitch was not responsible for the total injury.

Section 28–35–28(b) provides that the factual findings of a trial judge in the Workers' Compensation Court are final "unless an appellate panel finds them to be clearly erroneous." We have held that the statute provides the Appellate Division with *de novo* review of such factual findings except for credibility determinations made by the trial judge. *Davol, Inc. v. Aguiar*, 463 A.2d 170, 173–74 (R.I.1983).

In the instant case, although medical evidence was presented, the trial judge did not make a finding in respect to Stanley Bostitch's percentage of liability. He focused instead on the fact that Lambert had not worked for the thirteen weeks preceding his disability and therefore could not demonstrate an earning capacity. The trial judge made a factual finding that Lambert "failed to demonstrate by a fair preponderance of the credible evidence that he suffered a loss of earnings capacity on or about December 4, 1995, as a result of a work-related injury." On appeal, the Appellate Division noted that "the uncontradicted medical evidence establishes that the injury *partially* arose out of and in the course of [Lambert's] employment with [Stanley Bostitch]." The panel then stated that "[i]n the absence of evidence as to the degree to which the employment contributed to the disability, we find that the employer is responsible for fifty percent (50%) of the weekly compensation due to the employee."

▆▆▆▆ Although we have no assay for determining whether the Appellate Division's assessment of 50 percent responsibility for payment of workers' compensation benefits to Stanley Bostitch was the most rational or the most appropriate apportionment, we are of the opinion that as long as the decision of the Appellate Division rested on some competent evidence to support its finding, this Court will not attempt to revisit or recalculate its award. In this case, there existed sufficient evidence in the record to establish the fact that Lambert's disease was at least partially and possibly substantially occupational. In making an apportionment of benefits, the Appellate Division examined the evidence and drew inferences therefrom. Therefore, we refrain from second-guessing or re-calibrating its determination of the 50 percent award. But in so doing, we do not thereby endorse an automatic, mandatory 50 percent apportionment rule when neither party presents specific opinion evidence relating to that subject. We recognize only that in the absence of specific opinion evidence to support a certain percentage apportionment, the Appellate Division may make a reasonable apportionment based on reasonable inferences drawn from the totality of the evidence presented. Were we to do otherwise, this Court would become engaged in detailed review of another tribunal's factfinding. Such a task is ill-suited to an appellate court in light of the conclusiveness of the Appellate Division's findings of fact.

Therefore, in conclusion, we affirm the decree of the Appellate Division awarding benefits under the statute and its apportionment of those benefits. Consequently, we deny both petitions for certiorari, quash the writs previously issued, and return the record to the Appellate Division with our opinion endorsed thereon.